UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KELLY GLOVER,

                Plaintiff,

          -v-                    5:18-CV-837

ONONDAGA COUNTY
SHERIFF'S DEPARTMENT,
ONONDAGA COUNTY,
DOMINICK ALBANESE,
and SHARON MCDONALD,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                OF COUNSEL:

OFFICE OF JEFFREY R. PARRY    JEFFREY R. PARRY, ESQ.
Attorneys for Plaintiff
7030 East Genesee Street
Fayetteville, NY 13066

OFFICE OF JARROD W. SMITH    JARROD W. SMITH, ESQ.
Attorneys for Plaintiff
11 South Main Street
P.O. Box 173
Jordan, NY 13080

SMITH, SOVIK, KENDRICK &    KAREN G. FELTER, ESQ.
    SUGNET, P.C.             MATTHEW P. GERMAIN, ESQ.
Attorneys for Defendants

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I. INTRODUCTION

On October 19, 2016, plaintiff Kelly Glover ("Ms. Glover" or "plaintiff") was spotted on a surveillance camera using two counterfeit twenty-dollar bills to buy some groceries at a Wegmans Food Market in the Town of Clay in the County of Onondaga, New York (the "County").

The store phoned in a complaint. County Sheriff's Deputy Dominick Albanese ("Deputy Albanese") was dispatched to investigate. He went to the store. He examined the fake bills. He talked to the cashier who received them. He spoke to the employee who'd called in the complaint. And he reviewed the video footage showing a woman passing the counterfeit cash.

The woman on the surveillance video had used her Wegmans rewards card during the transaction. Those cards are linked to a person's name and home address. With the staff's help, Deputy Albanese determined that the rewards card used on the video had been issued to Ms. Glover. He pulled up plaintiff's photo ID in the DMV database. The picture seemed to match.

The next day, Deputy Albanese paid Ms. Glover a visit at her home. She answered the door and let him inside after he identified himself as a police officer. When he explained that he was investigating a forgery complaint, plaintiff admitted that she had been at the grocery store that day and paid with some twenty-dollar bills.

Based on everything he knew at that point in time, Deputy Albanese arrested plaintiff.  He took her to his patrol car and started filling out the arrest paperwork.  There, for the first time, plaintiff claimed she must've withdrawn the counterfeit bills from an ATM inside the store.  According to plaintiff, she had no idea the twenty-dollar bills were fake.

This was news to Deputy Albanese.  He had no immediate way to confirm or dispel Ms. Glover's story.  But he wanted to check it out.  So he dropped her off at the County jail to await arraignment.  By then, it was already past eleven o'clock at night.  But he headed back to the grocery store anyway, where he managed to cajole the store employee who'd helped him the night before into coming back to work on his night off.  Together, they reviewed more surveillance footage and were eventually able to confirm plaintiff's version of events: she had used an ATM inside the store to withdraw some money and then purchased groceries with the money she'd just taken out.

Deputy Albanese had seen enough.  He called his superiors and explained that Ms. Glover had a good defense to the forgery charge.  They conferenced in the duty prosecutor, who confirmed that plaintiff could be released from the County's custody.  Deputy Albanese headed right back to the jail, where he met Sergeant Sharon MacDonald ("Sergeant MacDonald").  There, Deputy Albanese and Sergeant MacDonald filled out paperwork needed to "unarrest" Ms. Glover, who had been waiting in a booking area.  Plaintiff signed off on a

- 3 -

standard waiver form and was released from custody at around two o'clock that morning.  Deputy Albanese even drove her home.

The whole affair took about four hours.  Over a year and a half later, on June 15, 2018, plaintiff filed this 42 U.S.C. § 1983 action in Supreme Court, Onondaga County, against the County, the Sheriff's Department, Deputy Albanese, and Sergeant MacDonald.  Because the suit raised federal claims, defendants removed the case to this judicial district, where it was assigned to Senior U.S. District Judge Gary L. Sharpe.  Dkt. No. 1.  Plaintiff later filed an amended complaint, Dkt. No. 13, that defendants answered, Dkt. No. 14.

Between December of 2018 and June of 2023, the parties engaged in a hotly contested period of discovery that necessitated repeated interventions by the assigned Magistrate Judge.  *See, e.g.*, Dkt. No. 35 (Judge Hummel); Dkt. No. 149 (Judge Baxter).  At the close of discovery, defendants moved under Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing plaintiff's claims.  Dkt. No. 141.  In response, plaintiff moved for an extension of time and to compel the production of discovery.  Dkt. No. 145.

On August 22, 2023, plaintiff's request was denied.  Dkt. No. 146.  There, an exasperated U.S. Magistrate Judge Andrew T. Baxter explained that:

> This court has, **on innumerable occasions**, addressed plaintiff's motions and complaints that the defendants must have had possession of various documents, including an arrest report relating to plaintiff, and the court has repeatedly directed the

defendants to produce any such records that still exist. The court provided plaintiff's counsel with extensive opportunities to conduct discovery regarding spoliation and to explore other means of seeking the "missing" documents.

After numerous representations from defense counsel that, after repeated investigation and searches, all existing documents had been produced, the court made clear to plaintiff that I could not compel defendants to produce documents that they claim no longer exist.   Plaintiff's counsel was repeatedly advised that his remaining recourse was to pursue a motion for spoliation sanctions and/or seek relief under Fed. R. Civ. P. 56(d) before Judge Sharpe in the context of dispositive motion practice. (See, e.g., Tr. of 4/27/2023 Telephone Conference at 6-7, 9-11, Dkt. No. 137).

Plaintiff's submission does not, in this court's view, appropriately comply with this court's guidance that he file a response to the defense summary judgment motion and a cross-motion for spoliation sanctions "argu[ing] that . . . there should be inferences drawn in your favor in connection with the summary judgment motion based on spoliation. (Id. at 9).

Instead, plaintiff's counsel doggedly continues to argue that the court should compel defendants to produce documents that defendants have continued to represent no longer exist.

This court will defer to Senior District Judge Sharpe as to whether plaintiff's submission should be accepted as his response to the summary judgment motion and cross-motion for spoliation, which Judge Sharpe will address as submitted, or whether plaintiff should be afforded additional time to file responsive papers.

Dkt. No. 146 (emphases and paragraph breaks inserted).  Shortly thereafter,

an equally exasperated Senior U.S. District Judge Sharpe weighed in on

plaintiff's request for an extension with an equally emphatic denial:

> On June 23, 2023, defendants moved for summary judgment (Dkt. No. 141.)   Plaintiff Kelly Glover, through her counsel Jeffrey Parry, sought a three-week extension of time to, among other things, respond to that motion. (Dkt. No. 143.)
>
> Counsel "assure[d the court] that plaintiff's response . . . c[ould] be completed in this period and timely filed." (Id. at 2.)   Instead of responding as promised, Parry moved for various relief, which motion has been partially denied by Magistrate Judge Andrew T. Baxter. (Dkt. No. 146.)
>
> **Unfortunately, Parry and his antics are all too familiar to the court.**  See Murphy v. Onondaga, No. 5:18-cv-1218.  This court whole-heartedly concurs with Magistrate Judge Baxter's observation that the motion filed yesterday by Parry does not "appropriately comply with [Magistrate Judge Baxter]'s guidance that [Parry] file a response to the defense summary judgment motion and a cross-motion for spoliation sanctions.["] (Dkt. No. 146.)
>
> The balance of Glover's motion left unaddressed by Magistrate Judge Baxter, (Dkt. No. 145), is DENIED. **The court does not consider yesterday's motion as a response to the summary judgment motion**, nor does it consider it a cross motion for sanctions due to the spoliation of evidence.
>
> Moreover, the court is not inclined to afford Glover additional time to file a response or cross motion due to **counsel's willful failure to do so** despite the myriad discussions with Magistrate Judge Baxter and Parry's assurance to this court that he would do so if afforded additional time. **Accordingly, defendants' motion for summary judgement is deemed unopposed** and will be addressed in due course.

Dkt. No. 147 (emphases and paragraph breaks inserted).  Plaintiff moved for

reconsideration, Dkt. No. 148, which was denied by Judge Baxter, Dkt. No.

149, and then by Judge Sharpe, Dkt. No. 150.  The matter has since been

reassigned to this Court for a decision.  Dkt. No. 152.

Defendants' unopposed motion for summary judgment will be considered

on the basis of the available submissions without oral argument.

## II. <u>BACKGROUND</u>[1]

Deputy Albanese works for the County Sheriff's Office.  Defs.' Facts, Dkt.

No. 141-39 at ¶ 1.  At the time of these events, he was relatively new to the

force.  *See id*. ¶¶ 82–83.  He worked the Night Watch, a shift that ran from

nine at night through seven in the morning.  *Id*. ¶ 1.  He reported to Sergeant

MacDonald.  *Id*. ¶¶ 78–80.

On October 20, 2016, around 2:00 a.m., Deputy Albanese got a call from

dispatch about a forgery complaint.  Defs.' Facts ¶¶ 1–2.  The complaint had

been called in by an employee at the Wegmans Food Market located at 7519

Oswego Road in the Town of Clay, New York.  *Id*. ¶ 2.  Deputy Albanese

responded to the call and headed to the grocery store, where he met with a

Wegmans Asset Protection Officer named Matthew J. Parisi.  *Id*. ¶ 4.

Parisi explained to Deputy Albanese that they had found two counterfeit

twenty-dollar bills at around 7:50 p.m., when one of the cashiers had turned

---

[1] Judge Sharpe determined that plaintiff "willful[ly] fail[ed]" to file an opposition to defendants'
motion for summary judgment.  Dkt. No. 147.  Accordingly, defendants' Statement of Material Facts,
Dkt. No. 141-39, will be deemed admitted to the extent that the factual claims are appropriately
supported by evidence in the record.  N.D.N.Y. L.R. 56.1(b); *Krul v. DeJoy*, –F. Supp. 3d–, 2023 WL
8449589, at *13–*15 (N.D.N.Y. Dec. 6, 2023) (explaining summary judgment briefing procedure).

in her cash register's till.  Defs.' Facts ¶ 5.  The cashier had been working at register number "7."  *Id*. ¶ 6.  Parisi explained that register #7 had just had a cash pick-up at 6:35 p.m. that had showed zero counterfeit bills.  *Id*.  So they knew that the counterfeit bills must have been passed between 6:35 p.m. and 7:50 p.m. that night.  *Id*. ¶ 7.  Parisi further explained that the store had reviewed its transaction logs, confirmed that a matching transaction at that cash register had occurred at around 6:57 p.m., and were able to pull the surveillance footage from that time period.  *Id*. ¶¶ 8–14.

The video footage showed a woman (soon identified as Ms. Glover) passing two counterfeit twenty-dollar bills (and one real one) to the cashier at register #7.  Defs.' Facts ¶¶ 17–20.  Because it was a quiet night at register #7, the store's records confirmed that plaintiff was the only person who could have passed the fake twenty-dollar bills at that time.  *Id*.  Deputy Albanese also learned from Parisi that plaintiff had used a Wegmans rewards card during her transaction, which was linked to her name and address.  *Id*. ¶ 16.

Deputy Albanese confirmed the details of Parisi's story and reviewed the surveillance footage for himself.  Def.' Facts ¶¶ 8–17.  He also examined the counterfeit bills.  *Id*. ¶ 21.  They lacked a watermark, a security thread, and were the wrong color.  *Id*.  Deputy Albanese used the information about the Wegmans rewards card to obtain Ms. Glover's picture from the Department

of Motor Vehicles ("DMV") database. *Id.* ¶ 20. He was able to confirm that plaintiff's picture matched the woman on the store's surveillance camera. *Id.*

Deputy Albanese obtained copies of this evidence and a statement from Parisi.[2] Defs.' Facts ¶ 23. By that time, it was well past 2:00 a.m., so Deputy Albanese decided to continue the investigation at the start of his next shift, which began around 9 o'clock that night. Defs.' Facts ¶ 35.

When his next shift started that evening, Deputy Albanese headed over to Ms. Glover's house using the address he had confirmed using the Wegmans rewards card and the DMV database. Defs.' Facts ¶¶ 41–42. She answered the door and let him inside after he explained that he was a law enforcement officer. *Id.* ¶ 44. Deputy Albanese told plaintiff that he was investigating a forgery complaint involving some counterfeit twenties. *Id.* ¶¶ 46–47. Deputy Albanese told plaintiff that she had been identified on the store's surveillance footage passing the fake bills. *Id.* ¶¶ 47–48. Plaintiff admitted that she was at the store at the time of the events, but she did not mention anything about pulling the money out of the ATM. *Id.* ¶¶ 48–49.

Based on everything he had learned, Deputy Albanese arrested Ms. Glover for first-degree criminal possession of a forged instrument, a state-law felony. Defs.' Facts ¶¶ 51, 65. He allowed plaintiff to speak with her teenaged son to

---

[2] Parisi stated to Deputy Albanese that Wegmans "had no desire for prosecution," but that did not end his investigation because the forgery qualified as a felony. Defs.' Facts ¶¶ 22, 25, 27.

make arrangements in her absence.  *Id*.  ¶¶ 52–57.  Then he *Mirandized* her and took her to his patrol car.  *Id*.  While Deputy Albanese was filling out the arrest paperwork, he asked plaintiff if she wanted to make a statement about the charge.  *Id*. ¶¶ 56–58.  It turns out she did: plaintiff told Deputy Albanese that she had withdrawn money from an ATM inside the store and used that money to purchase the groceries.  *Id*. ¶ 59.  Plaintiff said she had no idea that two of the bills she had used were fake.  *Id*.  According to plaintiff, they must have come out of the ATM.  *Id*.

Based on everything else he knew, Deputy Albanese was not simply going to take Ms. Glover at her word.  Defs.' Facts ¶¶ 60–63.  Even so, he wanted to check out her story.  But he still needed to finish up plaintiff's arrest.  So he called the duty prosecutor, who recommended bail.  *Id*. ¶¶ 65–69.  By that time, it was past ten o'clock at night.  *Id*. ¶ 73.  Deputy Albanese tried several times to contact the on-call judge for the Town of Clay so that plaintiff could be arraigned and possibly released on bail.  *Id*. ¶ 70.  But he was unable to reach the judge.  *Id*. ¶¶ 70–71.  So just after eleven o'clock that night, Deputy Albanese lodged plaintiff at the County's Justice Center, where she would ordinarily have been arraigned the next morning.  *Id*. ¶ 71.

Ms. Glover was never arraigned because Deputy Albanese got right back to work.  He called Sergeant MacDonald, his supervisor, to explain that Ms. Glover claimed she had withdrawn the fake bills from an ATM inside the

store.  Defs.' Facts ¶¶ 84–85.  They agreed that Deputy Albanese should go back to the store and try to verify plaintiff's claim.  *Id.* ¶¶ 87–89.  So Deputy Albanese called Parisi, the Wegmans asset protection officer, to meet him at the store.  *Id.* ¶ 95.  It was Parisi's night off, but he agreed to meet Deputy Albanese at the store anyway.  *Id.* ¶ 96.  After Deputy Albanese explained to Parisi that plaintiff claimed she had gotten the fake bills from the store's ATM, they were able to search through surveillance footage and eventually confirm plaintiff's explanation.  *Id.* ¶¶ 97–100.

Deputy Albanese immediately called Sergeant MacDonald to let her know that he had been able to confirm Ms. Glover's story using the surveillance footage.  Defs.' Facts ¶¶ 102–104.  They contacted the duty prosecutor, who agreed that plaintiff had a good defense to the charge for which she was in custody.  *Id.* ¶ 105.  He confirmed that plaintiff could be released.  *Id.* ¶ 106.

At about half past one o'clock in the morning, Deputy Albanese got back to the Justice Center.  Defs.' Facts ¶ 109.  There, he and Sergeant MacDonald filled out the paperwork needed to "unarrest" Ms. Glover: a single document called a "Certificate of Release and Waiver of Claims."  *Id.* ¶¶ 108–109.  With the paperwork completed, Deputy Albanese informed plaintiff that she was being immediately released from custody and was not being formally charged with a crime.  *Id.* ¶ 134.  Plaintiff signed the form and was released at about 2:15 in the morning.  *Id.* ¶¶ 139–140.  Deputy Albanese drove her home.  *Id.*

Ms. Glover was in County custody for a total of about four hours.

## III.  <u>LEGAL STANDARD</u>

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV.  <u>DISCUSSION</u>

Plaintiff's eight-count amended complaint purports to assert § 1983 claims under the Fourth, Fifth, Sixth, Seventh, and Fourteenth Amendments (Counts One and Five); a § 1983 conspiracy claim (Count Three); a § 1983 municipal liability claim (Count Four); state constitutional claims (Counts

Two and Five); and state common-law claims for fraud (Count Six), emotional distress (Count Seven), and simple negligence (Count Eight).  Dkt. No. 13.

### A.  42 U.S.C. § 1983

As an initial matter, some of the federal claims in plaintiff's amended complaint need to be untangled.  Count Three (for § 1983 conspiracy) and Count Four (for § 1983 municipal liability) are clear enough to analyze.  But Count One asserts a claim under § 1983 and references the "Fourth, Fifth, Sixth, Seventh, and Fourteenth Amendments," Am. Compl. ¶¶ 66–76, while Count Five purports to assert "constitutional torts" against Deputy Albanese and Sergeant MacDonald under the "Fourth, Fifth, Sixth[,] and Fourteenth Amendments," *id*. ¶¶ 91–94.

These generalized references to constitutional harm are not the clearest way to plead § 1983 claims.  Section 1983 is focused on whether a specific defendant's acts or omissions violated a specific constitutional right in a specific way.  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere.").  In other words, these are fact-bound theories of relief that benefit from a reasonable degree of precision.  *See, e.g.*, *Dukes v. City of Albany*, 492 F. Supp. 3d 4, 11 (N.D.N.Y. 2020) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault.").

For instance, plaintiff's references to the Fifth, Sixth, and (sometimes) the Seventh Amendment are puzzling.  This fact pattern involves a municipal defendant who investigated, arrested, and released plaintiff.  It involved suspicion of a state-law crime.  These facts raise Fourth and Fourteenth Amendment issues, not half the Bill of Rights.  *See, e.g.*, *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 168 (S.D.N.Y. 2019).

Even so, it is reasonably clear from the rest of the pleading what plaintiff intended to accomplish.  Broadly construed, Count One and Count Five, read together, assert § 1983 claims against the individual defendants for: (1) false arrest and imprisonment; (2) unlawful entry; (3) unreasonable search and seizure; (4) abuse of authority; (6) a violation of the right to privacy; (6) denial of due process; and (7) a violation of equal protection.  Am. Compl. ¶¶ 68, 92.

In addition, Count Three alleges a § 1983 conspiracy; *i.e.*, that one or more of the defendants conspired with each other or others to accomplish some or all of this unlawful conduct.  Am. Compl. ¶¶ 80–85.  And Count Four alleges a § 1983 claim for municipal liability; *i.e.*, that one or more of the County's policies or practices caused one or more of these harms.  *Id.* ¶¶ 86–90.

### 1. <u>§ 1983 claims against the Sheriff's Department</u>

As an initial matter, plaintiff's § 1983 claims against the County Sheriff's Department must be dismissed because (1) it lacks the capacity to be sued in

federal court and (2) a § 1983 claim asserted against it would be duplicative of a § 1983 claim against the County.  Defs.' Mem., Dkt. No. 141-40 at 13.[3]

The question of whether an entity has an independent legal existence is resolved by reference to state law.  FED. R. CIV. P. 17(b)(3).  "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued."  *Thomas v. Town of Lloyd*, –F. Supp. 3d–, 2024 WL 118939, at *4 (N.D.N.Y. Jan. 11, 2024) (citation omitted).

In short, a § 1983 claim against the Sheriff's Department, which is merely an administrative department of the County, is redundant of a § 1983 claim against the County itself.  Plaintiff's § 1983 claim(s) against the County will be discussed separately *infra*.  Accordingly, plaintiff's § 1983 claims against the Sheriff's Department must be dismissed.

**2.  Official-Capacity § 1983 Claims**

Plaintiff's § 1983 official-capacity claims against the individual defendants must also be dismissed.  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  An official-capacity § 1983 claim is sometimes used as a vehicle to enjoin an ongoing violation of federal law (under the doctrine

---

[3]  Pagination corresponds to CM/ECF.

of *Ex parte Young*) by naming a policymaking official in a way that evades an immunity bar (such as a state's sovereign immunity).

But plaintiff's amended complaint seeks only money damages against a set of non-immune, non-policymaking defendants; *i.e.*, the County, Deputy Albanese, and/or Sergeant MacDonald.  In short, these § 1983 official-capacity claims are redundant of the § 1983 claim(s) directly against the County.  *See, e.g.*, *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 498–99 (N.D.N.Y. 2017).  Accordingly, the § 1983 official-capacity claims against the individual defendants must be dismissed.

### 3.  <u>Individual-Capacity § 1983 Claims</u> (Counts One and Five)

Plaintiff asserts § 1983 claims against Deputy Albanese[4] and/or Sergeant MacDonald for: (i) false arrest and false imprisonment; (ii) unlawful entry; (iii) unreasonable search and seizure; (iv) abuse of authority; (v) violation of the right to privacy; (vi) a denial of due process; and (vii) a violation of equal protection.

---

[4] Discovery in this action seems to have produced evidence tending to show that Deputy Albanese engaged in official misconduct on one or more other occasions.  Dkt. No. 125.  That kind of evidence might have been useful for impeachment purposes at trial or to burnish a *Monell* claim by showing multiple instances of misconduct driven by the same policy or practice.  But this litigation is primarily about whether Deputy Albanese was "personally involved" in any misconduct vis-à-vis Ms. Glover that is actionable under § 1983, not what he might have done wrong on other occasions.

### i. **False Arrest and Imprisonment**

To establish a claim under § 1983 for a false arrest or false imprisonment, Ms. Glover must show that: (1) defendant intended to confine her; (2) she was conscious of the confinement; (3) she did not consent to the confinement; and (4) the confinement was not otherwise privileged. *See, e.g.*, *LaFever v. Clarke*, 525 F. Supp. 3d 305, 329 (N.D.N.Y. 2021). Because a "false arrest" is just a kind of "false imprisonment"; *i.e.*, the intentional, unprivileged confinement of another by someone acting with law enforcement authority, courts analyze these claims together. *See, e.g.*, *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

As relevant here, a "confinement" is considered "privileged" if it is based on "probable cause." *See, e.g.*, *Simpson v. City of N.Y.*, 793 F.3d 259, 265 (2d Cir. 2015). "The test for probable cause is an objective one and 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Yorzinksi v. City of N.Y.*, 175 F. Supp. 3d 69, 75 (S.D.N.Y. 2016) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007)).

"A police officer has probable cause to arrest when he has knowledge of reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the

person to be arrested has committed or is committing a crime." *Hulett*, 253 F. Supp. 3d at 494 (cleaned up).

Upon review, the facts establish that Deputy Albanese had probable cause to arrest Ms. Glover for criminal possession of a forged instrument. Under New York law, "[a] person is guilty of criminal possession of a forged instrument in the first degree when, with knowledge that it is forged and with intent to defraud, deceive or injure another, he utters or possesses [counterfeit or altered currency]. N.Y. PENAL LAW §§ 170.15, 170.30.

Before making the arrest, Deputy Albanese learned from Parisi, the asset protection officer, that two counterfeit twenty-dollar bills had been used by a woman to make a purchase. Deputy Albanese examined the two notes and concluded that they were counterfeit. He reviewed the surveillance footage, determined that it depicted a woman matching Ms. Glover's description, and confirmed her identity by cross-referencing the video footage and the rewards card information against DMV records. Then, after confronting plaintiff with this information, she admitted that she had been at the store at the time in question and made a purchase of groceries with several twenty-dollar bills.

Even viewed in the light most favorable to Ms. Glover, the non-movant, these facts obviously establish probable cause under the totality of the

circumstances.[5]  Indeed, several "[c]ourts in this Circuit have held that 'the passing of a counterfeit note coupled with an identification of the person who passed the note furnishes probable cause to arrest the individual identified as passing the note' for violating Section 170.30."  *Barr v. City of N.Y.*, 2018 WL 3407705, at *4 (S.D.N.Y. July 2, 2018) (quoting *Grant v. City of N.Y.*, 500 F. Supp. 2d 211, 215 (S.D.N.Y. 2007)).  Accordingly, defendants are entitled to summary judgment on these § 1983 claims.

## ii.  <u>Unlawful Entry</u>

"The Fourth Amendment generally prohibits a warrantless entry into an individual's home."  *Callahan v. City of N.Y.*, 90 F. Supp. 3d 60, 69 (E.D.N.Y. 2015) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).  A warrantless entry is unreasonable absent: (1) exigent circumstances; or (2) consent by a person with authority over the premises.  *See, e.g.*, *Seifert v. Rivera*, 933 F. Supp. 2d 307, 315 (D. Conn. 2013).

Upon review, the admitted facts defeat this claim because Ms. Glover consented to Deputy Albanese's entry into her home.  "To ascertain whether

---

[5]  In her own deposition testimony, plaintiff claimed that she told Deputy Albanese about her ATM withdrawal while the two were still inside her home.  Ex. G to Felter Decl. at 41.  But even if the Court were to credit that assertion for the purpose of summary judgment, it would not create a triable issue of fact probable cause.  An officer is not obligated to investigate defenses offered by the person being arrested.  *See, e.g.*, *Jocks v. Tavernier*, 316 F.3d 128, 135–36 (2d Cir. 2003).  While a failure to make a further inquiry can sometimes cast doubt on probable cause, *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010), the facts establish that Deputy Albanese acted reasonably, even accounting for the timing of this information.  Even assuming otherwise, qualified immunity would still pose a bar to this claim.

consent is valid, courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Kaminsky v. Schriro*, 243 F. Supp. 3d 221, 228 (D. Conn. 2017) (citation omitted).

Deputy Albanese went to Ms. Glover's residence at about 9:00 p.m.  Defs.' Facts ¶ 42.  He was in a marked patrol car.  *Id*.  He was wearing his police uniform.  *Id*.  Although plaintiff initially refused to let Deputy Albanese inside, she permitted him to enter the home after she concluded that he was, in fact, a member of law enforcement.  *Id*. ¶¶ 43–44. Plaintiff confirmed this at her deposition.  Ex. G to Felter Decl., Dkt. No. 141-8 at 37–39.  In fact, the amended complaint even alleges that plaintiff "invited" Deputy Albanese "into her home."  Am. Compl. ¶ 28.

Deputy Albanese did not have his gun drawn or make any showing of force.  Defs.' Facts ¶ 45.  Instead, Deputy Albanese "briefly discuss[ed]" his purpose at Ms. Glover's home, explained the results of his investigation, heard Ms. Glover's admission; *i.e.*, that she was admitting to the transaction with the fake currency, and decided to arrest her.  *Id*. ¶¶ 46–47, 51.  There is no indication that Deputy Albanese entered areas of plaintiff's home or searched without her consent; instead, he waited while she arranged for her mother to come look after her teenaged son, who suffers from a cognitive

disability.  Defs.' Facts ¶¶ 52–55.  Accordingly, defendants are entitled to summary judgment on this § 1983 claim.

### iii.  **Unreasonable Search and Seizure**

Upon review, this § 1983 claim must also be dismissed.  To be sure, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

But this Fourth-Amendment-based claim is duplicative of Ms. Glover's other Fourth Amendment claims for relief.  *See, e.g.*, *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 98 (E.D.N.Y. 2015) (explaining that this cause of action overlaps with unlawful detention and imprisonment).

To the extent this claim is separately cognizable and premised on the arrest or on the entry into her home, the "ultimate touchstone of the Fourth Amendment is reasonableness."  *Riley v. California*, 573 U.S. 373, 381 (2014).

Measured against that general standard, any arrest-based claim would fail because Deputy Albanese acted reasonably: plaintiff's arrest was based on probable cause.  Any entry-based claim would also fail because he acted reasonably there, too: plaintiff gave him valid verbal consent.

To the extent this claim might have been based on some use of force, the admitted facts establish that no force was used: Deputy Albanese informed

plaintiff she was under arrest, permitted her to make arrangements for her son, and then walked her to his patrol car.

To the extent this claim might have been based on a warrantless search, the admitted facts indicate that no search occurred: Deputy Albanese entered the home with plaintiff's consent, explained that he was investigating forged currency, decided to arrest her, and left with her in his custody.  Accordingly, defendants are entitled to summary judgment on this § 1983 claim.

### iv.  **Abuse of Authority or Process**

Plaintiff's amended complaint alleges that defendants' conduct was an "abuse of authority."  But as defendants point out, the closest analogue for this claim is either an "abuse of process" claim or perhaps a more generalized accusation that the County caused one or both of the individual defendants to violate plaintiff's constitutional rights.  Defs.' Mem. at 32–33.

Plaintiff's municipal-liability claim will be discussed *infra*.  However, to the extent this claim is understood as a § 1983 abuse-of-process claim, it must be dismissed because the admitted facts also defeat this claim.

"In order to establish liability for malicious abuse of process under § 1983, a plaintiff must establish the claim's elements under state law as well as the deprivation of a constitutional right."  *Wagner v. Hyra*, 518 F. Supp. 3d 613, 627 (N.D.N.Y. 2021) (quoting *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 446 (E.D.N.Y. 2012)).

Under New York law, a plaintiff may assert an abuse-of-process claim against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Wagner*, 518 F. Supp. 3d at 627 (quoting *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003)).

Plaintiff's amended complaint does not even plausibly allege a claim under this body of law. "The crux of a malicious prosecution claim is the collateral objective element." *Wagner*, 518 F. Supp. 3d at 632 (citation omitted). "A 'collateral objective' is usually characterized by personal animus, and may include infliction of economic harm, extortion, blackmail [or] retribution." *Id.* (cleaned up).

The facts establish that Deputy Albanese acted reasonably during his investigation and only arrested Ms. Glover after he had obtained probable cause. The facts further establish that Deputy Albanese took prompt action to confirm plaintiff's explanation. In fact, once he confirmed her story, he acted promptly to have plaintiff "unarrested"; *i.e.*, released from custody.

There is no indication that Deputy Albanese's conduct was aimed at some collateral objective. Indeed, there is no real indication that Deputy Albanese ever *used* any "process" at all: the arrest paperwork was never completed because Ms. Glover was released before arraignment. *See* Defs.' Facts ¶ 158.

The partial arrest paperwork was sealed and no formal arrest record was entered into the County's database, either.  *Id.* ¶¶ 160–174.  Accordingly, defendants are entitled to summary judgment on this § 1983 claim.

**v.  Right to Privacy**

Broadly construed, plaintiff's amended complaint asserts a § 1983 claim based on a so-called "strip search" of her person that occurred after Deputy Albanese lodged her at the Justice Center  But any such § 1983 claim would fail for at least two distinct reasons.

First, there is no indication that Deputy Albanese or Sergeant MacDonald were "personally involved" in any of the events that occurred at the Justice Center.  "To establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (cleaned up).  "State actors are considered 'personally involved' for the purpose of § 1983 when they directly participate in, or when they fail to intervene to prevent, a constitutional deprivation."  *Thomas*, 2024 WL 118939, at *4.

The facts establish that Deputy Albanese arrested Ms. Glover and took her to the Justice Center, where she was transferred to the custody of other, non-party Sheriff's Deputies at around 11:09 p.m.  Defs.' Facts ¶ 76.  Deputy Albanese contacted Sergeant MacDonald about plaintiff's explanation for the

fake currency. *Id*. ¶ 78. At that time, Sergeant MacDonald recommended that he follow-up and confirm (or dispel) this story. *Id*. ¶¶ 85–94.

Deputy Albanese left the Justice Center to do so. *See id*. There is no indication that either he or Sergeant MacDonald were involved in plaintiff's booking or any search of her person. In fact, Sergeant MacDonald did not even go down to the jail until around 1:30 a.m., when she helped Deputy Albanese fill out the paperwork needed to "unarrest" plaintiff. *Id*. ¶ 109.

Second, even on the merits, this claim would fail. "Strip searches of pre-trial detainees (as well as inmates) are constitutionally valid if they are reasonably related to a legitimate penological interest." *LaFever*, 525 F. Supp. 3d at 337–38 (quoting *Perez v. Ponte*, 236 F. Supp. 3d 590, 622–23 (E.D.N.Y. 2017)).[6] "In determining the overall reasonableness of a strip search, courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id*.

The facts establish that Ms. Glover set off the metal detector when she entered the booking area of the Justice Center. Defs.' Facts ¶ 121. Based on County policy, she was subjected to a strip search. *Id*. ¶¶ 119–121. She was

---

[6]  "A 'strip search' is an inspection of a naked individual, without any scrutiny of the subject body's cavities." *LaFever*, 525 F. Supp. 3d at 337. "A strip search is distinguishable from a 'visual body cavity search,' which extends to visual inspection of the anal and genital areas, or a 'manual body cavity search,' which includes some degree of touching or probing of body cavities." *Id*.

never subjected to the more intrusive "cavity search," which is performed by a physician pursuant to a court order.  *Id.* ¶¶ 123–125.  Absent a clear reason to conclude otherwise, the circumstances indicate that the search conducted at the Justice Center (by individuals other than Deputy Albanese or Sergeant MacDonald) was constitutionally reasonable.  Accordingly, defendants are entitled to summary judgment on this § 1983 claim.

**vi. <u>Due Process</u>**

Plaintiff's amended complaint asserts a claim based on the "denial of due process."  The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

The Due Process Clause protects procedural and substantive rights.  *Page v. Cuomo*, 478 F. Supp. 3d 355, 370 (N.D.N.Y. 2020).  Procedural due process requires "a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  Substantive due process protects against official action that is "arbitrary, conscience shocking, or oppressive in a constitutional sense," but not against conduct that is just "incorrect or ill-advised."  *Page*, 478 F. Supp. 3d at 371 (citation omitted).

Upon review, any due process claim based on this fact pattern must be dismissed.  Broadly construed, Ms. Glover's § 1983 claims involve a seizure of

her person that ripened into an arrest followed by a four-hour detention at the jail that ended in her release from custody without formal charges.

These § 1983 claims, however construed, implicate Fourth Amendment protections rather than a generalized notion of due process. To the extent plaintiff has attempted to assert a § 1983 *substantive* due process claim based on these facts, that claim is dismissed because it is duplicative of her more specific constitutional claims. *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (noting that where, as here, "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior," the specific Amendment, rather than a generalized notion of due process, governs the analysis).

To the extent that plaintiff has attempted to assert a § 1983 *procedural* due process claim, there is no indication plaintiff suffered a deprivation of a liberty interest that could be vindicated in a due process claim that might be distinguishable from her Fourth Amendment claims.[7] Finally, to the extent that plaintiff suggests in her deposition that the events of this case led to some kind of automatic, state-run, Department of Education-generated "block" on her fingerprints or that a letter about the arrest was sent to her

---

[7] For instance, some technical violation of the County's arrest procedures or claims about missing paperwork, absent more, would not give rise to a viable procedural due process claim. Nor would an unidentified non-party's refusal to permit plaintiff to use the bathroom at the Justice Center.

employer, there is no indication that either of the individual defendants actually named in this civil action were "personally involved" in any of those events.  Ex. G to Felter Decl. at 104–106; Defs.' Facts ¶¶ 176–77.  Besides, plaintiff testified that she is unaware of any negative consequences (which she called "damage control") that might have occurred as a result of this allegedly automatic "block" or notice.  *Id*.  Accordingly, defendants are entitled to summary judgment on this § 1983 claim.

### vii.  **Equal Protection**

Plaintiff's amended complaint also asserts a § 1983 claim based on the "denial of equal protection of the laws."  The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any persons within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This constitutional provision is "essentially a direction that all persons similarly situated be treated alike."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

"There are a number of common methods for pleading an equal protection claim."  *Kisembo v. N.Y. State Office of Children & Family Servs.*, 285 F. Supp. 3d 509, 523 (N.D.N.Y. 2018).  First, "[a] plaintiff could point to a law or policy that 'expressly classifies persons on the basis of race.'"  *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 570 (S.D.N.Y. 2013) (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999)).  Second, "a plaintiff could identify

a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *City of Oneonta*, 221 F.3d at 337 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)).  Third, "[a] plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Floyd*, 959 F. Supp. 2d at 570 (citation omitted).  Under any one of these three theories, a plaintiff "must prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (cleaned up); *see also Keles v. Davalos*, 642 F. Supp. 3d 339, 366–67 (E.D.N.Y. 2022).

Plaintiff has not done any of that.  However, even "[w]here there is no allegation of membership in a protected class, the plaintiff may still prevail on either a 'class of one' or 'selective enforcement' theory." *Brown v. Griffin*, 2019 WL 4688641, at *4 (S.D.N.Y. Sept. 25, 2019).  Pursuant to *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), a plaintiff may assert a "class of one" claim by alleging that "they were intentionally treated different from others similarly situated and that there was no rational basis for this difference in treatment." *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 558 (S.D.N.Y. 2006).  Alternatively, pursuant to *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980), a plaintiff may assert a "selective enforcement" claim by showing that they were treated differently based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise

of constitutional rights, or malicious or bad faith intent to injure a person. *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013) (citations omitted).

Measured against these theories, there is no indication that Ms. Glover has a viable § 1983 Equal Protection claim.  There is not even a whiff of any class-based animus from Deputy Albanese or Sergeant MacDonald.  Nor is there any hint that either defendant treated plaintiff differently based on any constitutionally impermissible criteria.  Accordingly, defendants are entitled to summary judgment on this § 1983 claim.

**4.  § 1983 Conspiracy** (Count Three)

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *Morpurgo v. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 331 (E.D.N.Y. 2010) ("To sustain a claim for conspiracy under Section 1983, a plaintiff must demonstrate that the defendant acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated the plaintiff's rights.").

Upon review, this claim must be dismissed.  As an initial matter, under the "intracorporate conspiracy doctrine," employees of a single entity are

legally incapable of conspiring together.  *See, e.g.*, *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013).  This rule extends to § 1983 claims against police departments and officers.  *Towns v. Stannard*, 2017 WL 11476416, at *4 (N.D.N.Y. Dec. 20, 2017) (Sannes, J.).

But even putting that issue aside, every single one of Ms. Glover's § 1983 claims against the individual defendants are already subject to dismissal for the reasons explained above.  In the absence of an underlying constitutional violation, a plaintiff "cannot sustain a claim of conspiracy to violate those rights."  *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000).  Accordingly, defendants are entitled to summary judgment on this § 1983 claim.

### 5.  § 1983 Claim against the County (Count Four)

Plaintiff's amended complaint asserts a § 1983 municipal-liability claim against the County based on its:

> actual and/or de facto policies, practices, customs and/or usages of failing to properly train, supervise or discipline its police officers concerning correct practices in conducting investigations, lawful search of individuals and/or their properties, seizure, obligation not to promote or condone perjury and/or assist in the prosecution of innocent persons and obligation to effect an arrest only when probable cause exists for such arrest, and additional, has failed to promulgate, put into effect and monitor the enforcement of appropriate rules and procedures to ensure that illegal and unconstitutional arrests do not occur.

Am. Compl. ¶ 87.

In *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality may be held liable under § 1983 if a plaintiff can demonstrate that the constitutional violation was caused by a municipal "policy or custom."  However, the Supreme Court has intentionally made these so-called "*Monell*" claims "hard to plead and hard to prove."  *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020).  "Unlike state tort law, a municipality cannot be held liable under § 1983 merely because it happened to employ the alleged tortfeasor."  *Id*.

Instead, "under § 1983[ ] local governments are responsible only for 'their own illegal acts.'"  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).  Thus, "to establish municipal liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that the deprivation of his constitutional right was 'caused by a governmental custom, policy or usage of the municipality.'"  *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order) (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).

Upon review, Ms. Glover's *Monell* claim or claims against the County must also be dismissed.  *Monell* is not a vehicle for attacking any wrongheaded policy or practice that might, in the abstract, violate someone's civil rights at some point or in some manner.  Instead, a municipal-liability claim is only

appropriate when a plaintiff is able to show that a particular municipal policy, practice, or custom—formal or informal, express or otherwise—*caused* a specific constitutional harm that they suffered.

As discussed *supra*, Ms. Glover has not established any viable § 1983 claims against the individual defendants that she has actually named in this civil rights suit.  Instead, it appears that plaintiff's attorneys are seeking to challenge one or more municipal policies or practices that are disconnected from the fact pattern presented by this case.  Indeed, as Judge Baxter observed:

> Now, I know that plaintiff's counsel have other fish to fry with respect to the Sheriff's Office, but I never really thought that this lawsuit was the appropriate vehicle for that, given that it involves a single plaintiff in a fairly specific discrete incident . . . .

Dkt. No. 137 at 13.[8]  Because plaintiff has failed to establish any underlying constitutional violation, her *Monell* claim—no matter how it might be construed or characterized against one or more of the County's alleged policies or practices—must be dismissed as well.  *See, e.g., Carter*, 394 F. Supp. 3d at 239–40 (explaining the "presence of an underlying constitutional

---

[8] Ms. Glover's attorneys have been litigating a second civil rights action against County officials with a different named plaintiff.  *Murphy v. Onondaga County et al.*, 5:18-CV-1218.  Early in this litigation, plaintiff's attorneys tried to consolidate the two cases, but that request was denied after a hearing.  Dkt. No. 38.  There, the Court noted that consolidation might "open the door" for plaintiff to "attempt to improperly bolster" Ms. Glover's position with evidence from the other action.  *Id.*  The *Monell* claim in this action rises or falls on the constitutional harm suffered by Ms. Glover, the only named plaintiff here, rather than any harm that might have been suffered by non-parties.

violation remains a 'required predicate'").  Accordingly, defendants are entitled to summary judgment on this § 1983 claim.

### B. <u>State-Law Claims</u>

Plaintiff's remaining claims arise under state law: the amended complaint asserts state-law constitutional claims (Counts Two and Five) as well as common-law claims for fraud (Count Six), emotional distress (Count Seven), and simple negligence (Count Eight).[9]

Upon review, these state-law claims must be dismissed.  First, plaintiff's state constitutional claims are improper where, as here, remedies for the alleged conduct were available under § 1983.  *See, e.g.*, *Talarico*, 367 F. Supp. 3d at 171–72 (collecting cases concluding same "where a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution").

Second, plaintiff's fraud claim is also subject to dismissal.  Generously construed, this claim seems to be based on the fact that Deputy Albanese and Sergeant MacDonald presented plaintiff with a waiver (that she signed) when she was released from custody.  In her view, this waiver was "false" and improper, and plaintiff was allegedly told she could only leave the jail if she signed the waiver.  Am. Compl. ¶¶ 96–100.

---

[9]  The parties are not diverse, so the basis for jurisdiction here is federal question.

The admitted facts establish otherwise.  Defs.' Facts ¶¶ 132–140.  But even if they did not, plaintiff was still released from custody immediately, and there is no indication that this waiver has been asserted by defendants as a defense to any of her claims based on these events.  As defendants explain in their moving brief, a plaintiff cannot maintain a fraud claim under these kind of circumstances.  Defs.' Mem. at 36–37.

Third and fourth, plaintiff's emotional distress and negligence claims are precluded by New York law, which does not recognize either claim when the fact pattern involves an arrest or prosecution.  Defs.' Mem. at 37–40.  Under those circumstances, the plaintiff must pursue the more specific iterations of her claims.  *Sullivan v. City of N.Y.*, 2018 WL 3368706, at *18 (S.D.N.Y. July 10, 2018) ("New York courts have long held that, where a plaintiff brings false-arrest and false-imprisonment claims, she cannot recover under broad principles of negligence."); *Crews v. Cnty. of Nassau*, 996 F. Supp. 2d 186, 214 (E.D.N.Y. 2014) (explaining that New York courts disallow IIED or NIED claims where the alleged conduct is redressable by traditional tort remedies).  Accordingly, defendants are entitled to summary judgment on plaintiff's state-law claims.

## V.  CONCLUSION

Deputy Albanese conducted a reasonably thorough investigation that eventually led him to believe he had probable cause to arrest Ms. Glover for

intentionally passing the two fake twenties.  Even after he heard plaintiff's innocent explanation, he very well could have just wished her luck at trial and moved on to other matters.  But he chose not to just sit on this new information.  Instead, he acted promptly to try to confirm her story.  And once he did so, he acted diligently to have plaintiff released from custody.

There is no indication in the existing record that either Deputy Albanese or Sergeant MacDonald were "personally involved" in any conduct that might give rise to a viable § 1983 claim or state-law claim.  And in the absence of an underlying constitutional violation, plaintiff cannot maintain her § 1983 claims for conspiracy or municipal liability, either.

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment is GRANTED; and

2.  Plaintiff's amended complaint is DISMISSED.

The Clerk of the Court is directed to terminate the pending motion, enter a judgment accordingly, and close the file.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  February 22, 2024
        Utica, New York.